UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 18 Cr. 109 (TSB) |
| ROMAN IAKOVLEV, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant was a member of a criminal enterprise that used a series of moving companies to exploit thousands of people across the county by demanding ransom for the personal possessions and cherished belongings those people had entrusted the enterprise to transport. For the reasons outlined, a Guidelines sentence of 41 to 51 months' imprisonment is appropriate.

## BACKGROUND

### I. The Offense Conduct

#### A. Background on Moving Regulations

The U.S. Department of Transportation ("USDOT"), Federal Motor Carrier Safety Administration ("FMCSA"), monitors and enforces regulations governing safety and commerce for interstate motor carriers. A portion of the regulations governs the transportation of household goods by licensed motor carriers (*i.e.*, moving companies). *See* 49 C.F.R. Part 375. All household goods motor carriers engaged in interstate transportation of household goods must follow the regulations. 49 C.F.R. 375.101. Failure to comply with these regulations could result in the USDOT ordering the company to cease operating as a mover of household goods.

Interstate movers must also register with the USDOT. In order for a moving company to be registered with the USDOT, the moving company must apply to operate as a motor property

carrier and receive a USDOT number. The USDOT number is a unique identifier used to monitor a company's safety information acquired during audits, compliance reviews, crash investigations, and inspections. A moving company may not lawfully transport household goods without an approved USDOT number. During the relevant period, the application to operate as mover of household good was known as an OP-1 form, or later, Form MCSA-1, and was available through FMCSA. On the OP-1 and MCSA-1 forms, all applicants must disclose, under penalty of perjury, any relationship with any other FMCSA-regulated entity within the past three years, including any ownership interests or management positions.

Under those regulations, carriers must provide all moving estimates for household goods to potential customers in writing and must indicate clearly whether the estimate is binding or non-binding. 49 C.F.R. 375.401. With a binding estimate, the customer and the moving company must both agree in writing to a fixed charge for all services prior to the start of any work. 49 C.F.R. 375.403. The moving company may re-negotiate the contract with the customer if the moving company believes after an on-site inspection that the weight of the actual shipment significantly exceeds the original estimate, but this re-negotiation must be done before any work is commenced and with the customer's full consent and knowledge. 49 C.F.R. 375.403. The moving company is expressly barred under the regulations from amending the estimate after loading the shipment. 49 C.F.R. 375.401. Failure to deliver a customer's shipment upon the customer's offer to pay the binding estimate amount (plus additional charges not relevant here) constitutes a failure to transport a shipment with "reasonable dispatch" under the regulations and subjects the moving company to "cargo delay claims." 49 C.F.R. 375.403.

Pursuant to federal regulations, movers must deliver household goods "in a timely manner." 49 C.F.R. 375.601. Unless the requirement is waived, movers "must tender a shipment for delivery for an individual shipper on the agreed delivery date or within the period specified on

the bill of lading." 49 C.F.R. 375.603.

Moving companies must follow the regulations and allow for regular inspections by federal regulators. Failure to meet the requirements set by USDOT can result in a moving company being placed out of service. A company placed out of service is no longer authorized under federal law to operate as a mover of household goods.

B. The Enterprise

The criminal enterprise charged in this case flouted these regulations. In doing so, over the course of five years, the criminal enterprise presented itself as at least 12 different moving companies, and profited from the exploitation and manipulation of thousands of victims. *See* Presentence Report ("PSR") ¶¶ 31-41, 48. Those victims hired the enterprise to move them, based on false representations and assurances by the enterprise members, as well as federal certifications obtained through fraud. *See id.* ¶ 44. The enterprise lured victims into binding contracts, containing square footage estimates that were purposefully low. *See id.* ¶¶ 44, 47. The enterprise then extorted the victims into paying more than contracted for based both on falsely inflated square footage numbers, but also by capturing the victims' goods on moving trucks before increasing the price for the moves. *Id.* ¶ 44. The enterprise then either delivered the goods late, or never delivered them at all. *See id.*

Whenever the aftermath of their crimes became too complicated and messy, the enterprise simply shed its skin and reincorporated as a new entity, with lies on their websites and documents about their experience, and lies on their federal forms about ownership and accountability. *See id.* ¶¶ 30, 44; Indictment at 7-9. They shielded their members by assigning them new names, and abandoning the phones and contact information of their tainted prior form. *See* Indictment at 8.

The completeness of their frauds, the thoroughness of their lies, enriched the enterprise handsomely. The conservative loss amount in this case is over $2.4 million. PSR ¶ 48.

C.  The Defendant's Role

As the defendant will admit at his plea, for three years, he worked as a warehouse employee and foreman of the North Carolina warehouse for the criminal enterprise. *Id.* ¶ 45. The North Carolina warehouse was one of multiple locations used by the enterprise. *Id.* In his role, the defendant tracked the actual square footage used by the victims' household goods—which the enterprise referred to as the "real" cubes—and emailed other members of the enterprise that information. *Id.* ¶ 46. The defendant's emails not only contained the real cubes, but also attached the documents that showed the customers had been charged based on a false, higher number. *Id.* The defendant's work in the warehouse allowed him to see firsthand that the enterprise refused to deliver customers' goods, holding them ransom, some indefinitely. *See id.*

The PSR details an example of the defendant's participation in the enterprise. *See id.* ¶ 47. At the end of 2015, a victim hired US Relocation Services—one of the enterprise's serial aliases—to move her from Maryland to North Carolina. *See id.* She received a binding estimate of $1600, and paid $400 as a deposit. *Id.* On the day of her move, after her goods were loaded onto the moving truck, the members of the enterprise increased the total cost of her move to approximately $4,178. *Id.* The victim gave the movers $678 in cash, and wrote a check (though she later stopped payment on the check). *Id.* The enterprise never delivered her goods, but stored them in the North Carolina warehouse. *Id.* The defendant sent the victim's paperwork to other members of the enterprise, detailing how the victim's goods used 1,000 cubic feet of storage space, though she was charged as if they used 2,000 cubic feet. *Id.*

When the enterprise was taken down in July of 2018, and its multiple warehouses were searched, law enforcement found the victim's goods in the North Carolina warehouse, still undelivered nearly three years later.

**II.         The Defendant's Plea and Guidelines Range**

The defendant is scheduled to plead guilty before the Court on September 4th. The defendant has requested to be sentenced on that same day.

Probation has calculated the defendant's Guideline range as follows (*see id.* ¶¶ 54-66):

Count One: 18 U.S.C. § 1962(d) – RICO Conspiracy

- The United States Sentencing Commission Guidelines Manual ("U.S.S.G."), effective Nov. 1, 2018, applies to this conduct.

- Pursuant to U.S.S.G. § 2E1.1, the base offense level is either 19, or the offense level applicable to the underlying racketeering activity, whichever is higher. Pursuant to U.S.S.G. § 2E1.1, Application Note 1, such determination is made by applying Chapter 3 Parts A, B, C, and D.

- The underlying racketeering activity applicable to the defendant is wire fraud, which is governed by U.S.S.G. § 2B1.1. Pursuant to § 2B1.1(a)(1), the base offense level is 7, because wire fraud has a statutory maximum penalty of 20 years' imprisonment.

- Pursuant to U.S.S.G. § 2B1.1(b)(1), because the loss exceeded $1,500,000, and was less than $3,500,000, 16 levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved 10 or more victims, 2 levels are added.

- The offense level for the underlying racketeering activity is 25, which therefore controls, pursuant to U.S.S.G. § 2E1.1.

- The USAO does not oppose a two-level reduction in offense level pursuant to U.S.S.G. § 3E1.1 based upon the defendant's acceptance of responsibility, provided that the defendant's conduct continues to demonstrate compliance with the terms of § 3E1.1. The defendant may be entitled to an additional one-level decrease pursuant to § 3E1.1(b) in recognition of the defendant's timely notification of his intention to plead guilty.

In accordance with the above, Probation calculated the total offense level at 22. PSR ¶ 66. Probation calculated the defendant's criminal history as I. *Id.* ¶ 71. The defendant's Guideline range then is 41 to 51 months' imprisonment. *Id*. ¶ 92. The Government agrees with Probation's Guidelines calculation.

**DISCUSSION**

**III.    The Defendant's Conduct Warrants a Guidelines Sentence**

The factors that the Court must consider when fashioning a sentence include the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the defendant's offense, the promotion of respect for the law, the need for just punishment for the offense, and the need for adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). All such considerations support a Guidelines sentence of incarceration for the defendant's crimes.

A.  <u>The Defendant's Crimes Harmed Myriad Victims</u>

The nature and circumstances of this offense are serious. Over the course of five years, the members of this criminal enterprise defrauded and exploited thousands of victims. The victims vary in age, status, employment, and numerous other metrics, but are united in one simple way – they all were trying to move safely and efficiently their most precious, personal possessions from one home to another. They were seeking new refuge, whether it was down the street or across the country, and they entrusted the members of the criminal enterprise to help them reach it.

The victims were not naïve in hiring the enterprise; it was the enterprise that ruthlessly manipulated the means through which even the most diligent customer would seek to investigate them before hiring. If victims went to the affiliate companies' websites, they would see false declarations, like the newly-formed company was celebrating its 20th anniversary. If the victims went to review websites, they would read glowing missives penned by the criminals themselves, describing how "great" and "professional" the company was. Even if the victims went to the U.S. Department of Transportation, they would find USDOT numbers for the affiliated companies, acquired through misrepresentations and lies.

After doing their research, the victims were then drawn in by promises of low rates and prompt deliveries. They booked binding estimates, which were supposed to be just that. They

relied on the members of the enterprise, not knowing the people they were speaking to in the sales office were using fake names, and the numbers they were calling would one day just stop working, the repeated rings ignored by the same people who were offering false assurances.

After signing the contracts, the victims then made plans, dependent on their belief that the criminal enterprise would do what it claimed it would do. The victims purchased homes, signed leases, made arrangements with employers, babysitters, family members. They prepared themselves for the stresses and challenges that come from even the most efficient and fair moves.

On the day of the victims' appointed moves, members of the criminal enterprise came into their homes, boxed up their most personal and cherished possessions, and loaded them up on trucks. Then they changed the deal. They claimed the loads were bigger than they were. They claimed the square footage was off. They demanded payment upfront, and signatures on documents falsely asserting that any change had been agreed to prior to loading. They threatened to unload, or not deliver, the victims' possessions.

What were the victims to do then? They stared into loaded trucks containing their "household goods," terms of art that contain much more than those words suggest. Household goods in this case means diplomas, baby books, irreplaceable family heirlooms, even relatives' ashes. In those moments when the victims were at their most vulnerable, they agreed to whatever they needed to in a sometimes vain attempt to keep hold of those items that enriched and documented their lives.

Some of those victims received their goods, after paying more than they should have. Some of those victims never did, left to seek reimbursement for items that can never be replaced, whose value can never be calculated in simple dollars.

After all this, those victims then had to rebuild their lives in their new home, knowing they had been defrauded in their most vulnerable moment, held hostage by an enterprise that viewed

7

such violations as a business model.

These tragedies played out again and again and again. By the case agent's calculation, approximately 90% of moves conducted by the enterprise and subject to the agent's analysis were fraudulent. *See* PSR ¶ 48. With deception this pervasive, the members of the enterprise all knew what was going on. Together, they profited off of the exploitation of thousands of people. And they did it over multiple years.

The defendant was not the head of the enterprise, nor as involved as other members. But he knew the scheme, participated in it for years, and benefitted from its continuing existence.

B. The History and Characteristics of the Defendant Support a Guidelines Sentence

As the defendant admits in his plea, he began working for the enterprise in at least June of 2015 up until his arrest in July of 2018. PSR ¶ 45. His work for the enterprise began only months after his first arrival in this country, after winning the green card lottery in Russia. *Id.* ¶ 75. Gifted with the opportunity of life in America, the defendant chose to get involved with a criminal enterprise close in time to his arrival. His choice is all the more troubling given his prior employment as a lawyer and bailiff, responsible for "identify[ing] company fraud." *Id.* ¶ 88. A well-educated person attuned to the complexities of corporate malfeasance, he has no excuse for choosing to participate for years in this criminal enterprise. That participation continued until his arrest – at no point during his three years of employment did he walk away from the pervasive fraud. Instead, he "worked his way up to warehouse manager" after starting as a helper. *Id.* ¶ 89. His acceptance of responsibility occurred only after his arrest, once the enterprise was taken down.

C. A Guidelines Sentence Deters Other Bad Actors in the Moving Industry

The criminal enterprise defrauded customers in a way the FMCSA labels "common" within

8

the moving industry.[1]  A June 2020 study conducted by the Better Business Bureau reported that FMCSA received 4,780 complaints related to moving companies in 2019.[2]  The Better Business Bureau reported "[a]t least 1,335 moving companies have earned an 'F' rating from BBB due to unresolved or unanswered complaints, unusually large amounts of complaints, and other factors." In their estimation, "[t]he general public is at serious risk of encountering a dishonest moving operation[.]"

Only meaningful penalties will possibly deter the numerous bad actors in the moving industry.  Only serious consequences will possibly prevent fraudsters from preying on a large and particularly vulnerable population.  Only a term of incarceration will possibly convince other corrupt movers to operate in accordance with the federal regulations designed to protect the millions of Americans who move each year.

The need for deterrence and to promote respect for the law supports a Guidelines sentence.

---

[1] FMCSA, "File a Moving Fraud Complaint," available at: https://www.fmcsa.dot.gov/protect-your-move/file-a-complaint ("There are many kinds of moving fraud.  One of the most common is when a 'rogue' mover provides a low cost quote to perform an interstate move, loads your goods onto their truck, and then claims your load is over the weight estimate and the additional weight will be charged at an exorbitant price per pound.  Consumers are forced to pay double or higher the original estimate just to get their belongings back.").

[2] BBB, "Know Your Mover," available at: https://www.bbb.org/globalassets/local-bbbs/council-113/media/scam-studies/bbb-movers-scam-study.pdf.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence in this case is appropriate.

Dated:      Cincinnati, Ohio
               August 27, 2020

                                            Respectfully submitted,

                                            DAVID M. DEVILLERS
                                            United States Attorney

                                            s/*Megan Gaffney*
                                            MATTHEW C. SINGER
                                            MEGAN GAFFNEY
                                            Assistant United States Attorneys
                                            221 East Fourth Street, Suite 400
                                            Cincinnati, Ohio 45202
                                            (513) 684-3711

**CERTIFICATE OF SERVICE**

The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, she caused the Government's Sentencing Memorandum to be served on counsel for the defendant electronically.

Dated:    Cincinnati, Ohio
         August 27, 2020

                                        Respectfully submitted,


                                        /s/Megan Gaffney_____
                                        Megan Gaffney
                                        Assistant United States Attorney